RECEIVED
NOV - 5 2012
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| DONALD COMEAUX | CIVIL ACTION 12-0767 |
| VERSUS | JUDGE DOHERTY |
| ANGI TRAHAN, ET AL. | MAGISTRATE JUDGE HILL |

## MEMORANDUM RULING

Pending before this Court is the Motion to Dismiss for Failure to State a Claim [Doc. 24] filed by defendant Coldwell Banker Real Estate, LLC ("CBREC"), seeking dismissal of the plaintiff's claim for discriminatory housing practices pursuant to the standards of Fed. R. Civ. P. 12(b)(6). The motion is opposed by the plaintiff [Doc. 41].

**I.  Factual and Procedural Background**

The instant lawsuit alleges racial discrimination[1] in the sale of a residential home. Plaintiff Donald Comeaux makes the following allegations, all of which are considered true for the purposes of this motion. Plaintiff alleges he sought to purchase a home located at 227 Gina Drive in Duson, Louisiana, and that Pelican Real Estate, Inc., d/b/a Coldwell Banker Pelican Real Estate ("Pelican") listed the property for sale on its website on September 25, 2007. Federal Home Loan Mortgage Corporation ("Freddie Mac") owned the property and had previously hired Pelican and Coldwell Banker to represent it in selling the property. Comeaux learned of the property's availability on or

---

[1] Although the plaintiff alleges in his Amended Complaint that he is African-American, nowhere in CBREC's motion to dismiss is the plaintiff's race mentioned, and dismissal is not sought on the basis that the plaintiff is *not* the member of a protected class. However, the facts as alleged by the plaintiff do not indicate that defendant Trahan saw the plaintiff before rejecting his offer to purchase, or otherwise knew for certain the plaintiff was African-American at the time of the incident in question. Rather, in his Amended Complaint, the plaintiff alleges that "any person who heard Mr. Comeaux's voicemail message would have known his race." [Doc. 19, ¶26] Not knowing whether this is accurate or not, the Court makes no determination in this Ruling regarding whether the plaintiff has sufficiently pled a claim for *discriminatory housing practices*, as this Court cannot know whether Trahan knew the plaintiff was the member of a protected class at the time of the alleged incident.

about October 14, 2007, via Pelican's and Freddie Mac's websites. That same day, Comeaux called Pelican's office to inquire about purchasing the property. When no one answered the call, Mr. Comeaux left a voicemail message on a machine whose outgoing message indicated Comeaux had reached "Coldwell Banker Pelican Real Estate." After leaving a voicemail message, Comeaux continued to call Pelican's office on October 14, 2007, but no one answered those calls, and Pelican's answering machine did not pick up.

Also on October 14, 2007, Comeaux real estate agent, Marion LeDay, sent a fax to Pelican's office that contained the following documents: (1) a signed document entitled "Louisiana Residential Agreement to Buy or Sell" (the "Franchise Agreement"), which constituted an offer to purchase the property at the full listing price of $57,900; (2) proof of Comeaux's pre-approval for a mortgage up to $213,750 from ExpressPath through InstaMortgage.com; and (3) a copy of a $1,000 check, which was intended to be an earnest money deposit on the property.

The next day, on October 15, 2007, LeDay spoke with defendant Angi Trahan, a real estate agent employed by Pelican. When LeDay inquired about purchasing the property located at 227 Gina Drive, Trahan informed LeDay that a contract to purchase the property was already pending, but that Comeaux's offer would be submitted as a "back-up" offer.[2] Comeaux argues defendant Trahan did not make another Pelican agent, Gena Shelton Dunn, aware of Comeaux's offer until October 16, 2007, nor did Trahan make Freddie Mac aware of Comeaux's offer until October 16, 2007. Furthermore, Comeaux alleges it wasn't until October 16, 2007 that defendant Trahan asked the other prospective buyer – an individual identified in the pleadings only as "Mr. Rodriguez" – to demonstrate he had been pre-approved for the loan. Comeaux further alleges Freddie Mac did not

---

[2] Comeaux argues that by offering to accept his offer as a "back-up," Trahan effectively denied Comeaux's offer to CBREC to purchase the property.

enter into a contract for sale with Mr. Rodriguez until October 22, 2007, and the contract between Freddie Mac and Mr. Rodriguez was not finalized until October 31, 2007. Comeaux also argues Mr. Rodriguez's offer to purchase the property was below the listing price, while Comeaux's offer was for the full listing price.

On October 22, 2007, Comeaux filed a complaint with the Unites States Department of Housing and Urban Development ("HUD"). HUD referred the complaint to the Louisiana Department of Justice ("LADOJ") for investigation. After investigating Comeaux's complaint, LADOJ issued a "Determination of Reasonable Cause" to find that the defendants committed discriminatory housing practices.

Comeaux filed the instant lawsuit on March 29, 2012, naming Pelican, CBREC, Trahan, and Freddie Mac as defendants, and specifically asserting a claim for discriminatory refusal to sell a dwelling based on race against CRBEC. In his Complaint and Amended Complaint, Comeaux argues CRBEC's "rejection of Mr. Comeaux's full-priced offer by Defendant Pelican's agent, Defendant Trahan, while the property remained otherwise available, constituted a discriminatory refusal to sell housing practice in violation of 42 U.S.C. 3601, et seq." [Doc. 19, ¶45].

In the instant motion, CBREC argues it maintains a residential real estate brokerage network consisting of a large number of independently owned and operated franchised residential real estate brokerage offices, and that Pelican is one of the independently owned and operated franchises of CBREC. CBREC denies all liability, arguing Comeaux has not sufficiently pled a claim against CBREC, as the franchisor, for the alleged wrongful acts of Pelican, its franchisee.[3] CBRFEC relies

---

[3] Again, nowhere in CBREC's motion does CBREC seek dismissal on the basis that the plaintiff is not the member of a protected class. However, *based upon the facts as alleged by the plaintiff*, it remains unclear to this Court whether any defendant knew the plaintiff was African-American at the time the defendants rejected his offer to purchase the property in question.

on the following language contained within the Franchise Agreement between CBREC and Pelican in seeking the dismissal of Comeaux's claim for discriminatory housing practices against it:

> Section 14.01 <u>Relationship of Franchisee to Franchisor</u>. It is expressly agreed that the parties intend by this Agreement establish between Franchisor and Franchisee the relationship of Franchisor and Franchisee. It is further agree that Franchisee has no authority to create or assume in Franchisor's name or on behalf of Franchisor, any obligation, express or implied, or to act or purport ot act as agent or representative on behalf of Franchisor for any purpose whatsoever. Neither Franchisor nor Franchisee is the employer, employee, agent partner, fiduciary or co-venturer of or with the other, each being indepedent. Franchisee agrees that it will not hold itself out as the agent, employee, partner or co-venturer of Franchisor. All employees hired by or working for Franchisee shall be the employees of Franchisee and shall not for any purpose be deemed employees of Franchisor nor subject to Franchisor's control.

CBREC filed the instant motion on August 15, 2012, and the issues contained therein are now ripe for review.

**I.     Law and Analysis**

    **A.     Motion to Dismiss or Motion for Summary Judgment?**

As an initial matter, this Court addresses whether the instant motion can be adjudicated under the standards of Rule 12(b)(6) or whether the motion must be converted to one for summary judgment. Necessitating the foregoing consideration is CBREC's reference in its motion to the Franchise Agreement, executed between CBREC (as "franchisor") and Pelican (as "franchisee"). Although the motion to dismiss refers to the Franchise Agreement, the Franchise Agreement itself was not attached to the motion to dismiss, nor was it attached to the plaintiff's Complaint or Amended Complaint. In a series of Minute Entries [Docs. 28, 33, 40], the Court ordered that the parties address the issue of whether reference to a document in a motion to dismiss – where the document is not attached to either the plaintiff's complaint or the motion to dismiss – allows the court to consider the motion under the standards of Rule 12(b)(6).

The parties filed a series of responses [Docs. 29, 34, 38], in which they explained the Franchise Agreement was not attached to the plaintiff's Amended Complaint by agreement of counsel due to the confidential nature of the Franchise Agreement itself. Nevertheless, the parties agree plaintiff referenced portions of the Franchise Agreement in his Amended Complaint by making certain allegations in the Amended Complaint "on information and belief." Ergo, in their "Joint Pocket Brief" [Doc. 35], the parties "jointly stipulate that portions of the Franchise Agreement are referenced in the Amended Complaint and are central to Plaintiff's claims against CBREC" [Doc. 35, p. 2]. The parties also "jointly stipulate that the Court may consider the Franchise Agreement when ruling on CBREC's Rule 12(b)(6) Motion to Dismiss without converting the Motion to a Rule 56 Motion for Summary Judgment." [*Id.* at p. 3.]

When considering a Rule 12(b)(6) motion, a court may consider documents outside the complaint when they are: (1) attached to the motion; (2) referenced in the complaint; and (3) central to the plaintiff's claims. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (finding consideration of insurance contracts unattached to the complaint permissible where they were attached to the motions to dismiss, referred to in the complaint, and central to the plaintiffs' claims); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2008) (directing courts to "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *Causey v. Sewell Cadillac–Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004); *Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir.2003).

In all of their responses, the parties have correctly noted the controlling jurisprudence on the

issue. However, in the cases cited by the parties, the documents in question were attached to either the complaint, the amended complaint, or the motion to dismiss itself. In the instant case, the Franchise Agreement was attached to none of the foregoing, despite the parties' joint contention that the Franchise Agreement is specifically referenced in the plaintiff's Amended Complaint. When asked to address the specific factual scenario arising herein – that is, non-attachment of the document in question to either the complaint or the motion itself for confidentiality reasons, but reference to the document in the motion to dismiss – the parties did not do so.

Notwithstanding the failure of the parties to address this question in their briefs, it appears to this Court that the instant motion should be considered under Rule 12(b)(6). First, the parties have stipulated that the Franchise Agreement was specifically referenced in the plaintiff's Amended Complaint and was not attached to the Amended Complaint only because of the confidentiality issues related thereto. The parties have also stipulated that the motion should be decided under the standards of Rule 12(b)(6). Additionally, when they filed their Joint Response [Doc. 35], the parties attached and submitted, for *in camera* review, a complete copy of the Franchise Agreement, which, this Court believes, satisfies the requirement that the Franchise Agreement be attached to the briefing filed in connection with the motion to dismiss in order for nthe motion to be considered under Rule 12(b)(6).

Considering the foregoing, this Court concludes the instant motion should be decided as a motion to dismiss under the standards of Rule 12(b)(6), and should not be converted to a motion for summary judgment.

**B.      Standard of Review**

Until the Supreme Court decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct.

1955, 167 L.Ed.2d 929 (2007), courts routinely followed the rule that, "a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff could prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Marsh v. Butler County*, 268 F.3d 1014, 1022 (11th Cir.2001). However, pursuant to *Twombly*, to survive a motion to dismiss, a complaint must now contain factual allegations which are "enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." 127 S.Ct. at 1965.

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), *quoting Twombly*, 550 U.S. 544, 547, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232–33 (5th Cir.2009); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir.1996). But the Court is not bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 129 S.Ct. at 1949–50. A legally sufficient complaint must establish more than a "sheer possibility" that plaintiff's claim is true. *Id.* It need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action. *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim. *Lormand*, 565 F.3d at 255–57. If there are insufficient factual allegations to raise a right to relief above the speculative

level, *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, *Jones v. Bock*, 549 U.S. 199, 215, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Carbe v. Lappin*, 492 F.3d 325, 328 & n. 9 (5th Cir.2007), the claim must be dismissed.

C.  **Analysis**

In the instant case, CBREC cites the following provision of the Franchise Agreement between CRBEC and Pelican as evidence that defendant Trahan is not an employee of CBREC and CRBEC cannot, therefore, be vicariously liable for Trahan's actions:

> Section 14.01 <u>Relationship of Franchisee to Franchisor</u>. It is expressly agreed that the parties intend by this Agreement establish between Franchisor and Franchisee the relationship of Franchisor and Franchisee. It is further agree that Franchisee has no authority to create or assume in Franchisor's name or on behalf of Franchisor, any obligation, express or implied, or to act or purport ot act as agent or representative on behalf of Franchisor for any purpose whatsoever. Neither Franchisor nor Franchisee is the employer, employee, agent, partner, fiduciary or co-venturer of or with the other, each being indepedent. Franchisee agrees that it will not hold itself out as the agent, employee, partner or co-venturer of Franchisor. All employees hired by or working for Franchisee shall be the employees of Franchisee and shall not for any purpose be deemed employees of Franchisor nor subject to Franchisor's control.

Comeaux responds by arguing he has pled sufficient facts to assert a claim that CBREC sufficiently *controlled* the business practices of Pelican and its agents/employees such that CBREC can be found liable for discriminatory housing practices. The Court notes it is unclear whether the plaintiff is arguing CRBEC can be liable for the discriminatory housing practices *of its agent, Pelican*, or for its *own* discriminatory housing practices. Nevertheless, it is not necessary for the Court to make such a determination at this time, as this Court concludes Comeaux has pled sufficient facts to show CBREC might have exerted sufficient control over Pelican's employees to be liable for Trahan's actions or for its own actions.

It is unclear exactly what law will apply to the plaintiff's claims against the various defendants, and the parties have not briefed that issue in any detail. Under Louisiana law,[4] it would appear to this Court that a franchisor can be liable for the acts of a franchisee, either where the franchisor had actual authority or control over the conduct that caused the harm, or where the franchisee had apparent authority to act on behalf of a franchisor. Under Louisiana law, "[a]pparent authority is a judicially created concept of estoppel which operates in favor of a third party seeking to bind a principal for the unauthorized act of an apparent agent." *Ledet v. Fleetwood Enterprises, Inc.*, 245 F.3d 791, *6-7 (5th Cir. 2000) (unpublished),[5] *citing Boulos v. Morrison*, 503 So.2d 1, 3 (La.1987). "Implied or apparent agency exists if the principal has the right to control the conduct of the agent and the agent has the authority to bind the principal." *Urbeso v. Bryan*, 583 So.2d 114, 117 (La. App. 4th Cir. 1991); *see also Barrilleaux v. Franklin Found. Hosp.*, 683 So.2d 348, 354 (La. App. 1st Cir. 1996). The Court in *Boulos* explained:

> For the doctrine of apparent authority to apply the principal must first act to manifest the alleged agent's authority to an innocent third party. Second, the third party must rely reasonably on the manifested authority of the agent.... [T]he principal will be bound for the agent's actions if the principal has given an innocent third party a reasonable belief the agent had authority to act for the principal. *Boulos*, 503 So.2d at 3. "Apparent agency is established by the words and conduct of the parties and the circumstances of the case. An agency relationship may be created even though there is no intent to do so." *Urbeso*, 583 So.2d at 117; *see also Barrilleaux*, 683 So.2d at 354. However, "[a]n agency relationship is never presumed; it must be clearly established." *Barrilleaux*, 683 So.2d at 354.

503 So.2d at 3.

---

[4] No party has briefed the issue of what law applies to the underlying claims of housing discrimination against CBREC. Based on the facts as set forth in the briefs, this Court assumes without deciding that the Louisiana law of agency and apparent agency applies in this case. However, if the Louisiana law of agency/apparent agency does not apply, the motion would still be denied for the failure of CBREC to carry its burden on the issue of what law applies.

[5] Although the *Ledet* case is unpublished and, therefore, lacks precedential value, this Court finds its rationale persuasive, as it cites to several Louisiana cases applying Louisiana law.

The burden of proving apparent authority is on the party seeking to bind the principal. *Ledet*, 245 F.3d at 6-7. A third party may not blindly rely on the assertions of an agent, but has a duty to determine, at his peril, whether the agency purported granted by the principal permits the proposed act by the agent. *Id.*

In the instant case, although the Franchise Agreement would appear to proscribe the notion that Trahan was an employee of CBREC, it is unclear whether the application of implied or apparent agency might apply, where Comeaux alleges he believed he was dealing with Coldwell Banker when he attempted to purchase the property in question. Indeed, when Comeaux called Pelican's offices on October 14, 2007, the answering machine indicated Comeaux had reached "Coldwell Banker Pelican Real Estate."

In support of its motion, CRBEC cites to several cases that are distinguishable from the facts of this case. For example, CBREC cites *Pinero v. Jackson Hewett Services, Inc.*, 638 F.Supp.2d 632, 640 (E.D. La. 2009), in which the court held that a principal is liable for the actions of its agent "when the relationship of the parties includes the principal's right to control physical details of the actor as to the manner of his performance which is characteristic of the relation of master and servant." *Pinero* involved a plaintiff whose confidential personal information was provided to a franchisee of Jackson Hewitt Tax Service, Inc. An employee of the franchisee threw plaintiff's, as well as several other individuals', confidential tax information into a public dumpster. The information was ultimately discovered by an individual who turned it over to a television news station, which then returned the information to the plaintiffs and the other individuals whose information had been compromised. *Pinero*, 638 F.Supp.2d at 634-35.

The plaintiff sued Jackson Hewitt for, *inter alia*, invasion of privacy. The district court

concluded the plaintiff did not allege sufficient facts to assert a claim for invasion of privacy against Jackson Hewitt, in the face of a franchise agreement between Jackson Hewitt and its franchisee, which stated the franchisee was not an employee of Jackson Hewitt. *Id.* at 641-42. Noted the court in Pinero:

> Even if the Court assumes that Hall was Jackson Hewitt's agent, under Louisiana law, a principal/agent relationship is not alone sufficient to sustain a claim for vicarious liability. Liability for the tortious conduct of an agent does not flow from the principal-agent relationship. A principal is liable for the torts of its agent "[o]nly when the relationship of the parties includes the principal's right to control physical details of the actor as to the manner of his performance which is characteristic of the relation of master and servant."
>
> *Here, plaintiff has not alleged facts tending to suggest that the relationship between Hall and Jackson Hewitt was in the nature of master-servant. Plaintiff has conclusorily alleged that Jackson Hewitt was plaintiff's "employer/principal" and has attached an agreement that directly contradicts this assertion. The allegation of such a relationship is apparently based on Jackson Hewitt's status as the franchisor of Crescent City. Plaintiff has pleaded no other facts to support such an assertion. Plaintiff has pleaded no facts suggesting that Jackson Hewitt exercised any control over Hall in the details of the performance of her job. And the franchise agreement plaintiff attached to her complaint contradicts her allegations of a master-servant relationship. As cited, supra, the agreement specifically states that Jackson Hewitt does not have an employer or principal relationship with Crescent City's employees. The agreement also states that Crescent City is responsible for all decisions regarding the hiring, firing, supervising, disciplining, and training of its employees. The agreement shows that Hall was in a master-servant relationship with Crescent City, not Jackson Hewitt. Absent allegations that indicate that Jackson Hewitt controlled Hall in the performance of her job, the Court finds that plaintiff has not stated a claim for relief that is "plausible on its face." Plaintiff's privacy claim against Jackson Hewitt must be dismissed.*

*Id.* at 641 (emphasis added).

In contrast, in the instant case, Comeaux alleges in his Amended Complaint the following facts that might evidence control by CBREC over Pelican:

- On information and belief, Defendant Coldwell Banker granted Defendant Pelican permission to use, and Pelican did use, Coldwell Banker's logo, the "Coldwell Banker" name, color schemes, advertising platform and other trademarks. As a

11

result, Mr. Comeaux believes, and had reason to believe, that Defendant Pelican was part of Defendant Coldwell Banker. On information and belief, Defendant Pelican was acting as an agent of Coldwell Banker in the sale of the Property. [Doc. 19, ¶10]

- On information and belief, at all relevant times material to this lawsuit, Defendant Coldwell Banker maintained actual control over Defendant Pelican's ability to conduct Pelican's business of selling residential and commercial buildings. [Doc. 19, ¶11]

- On information and belief, at all relevant times material to this lawsuit, Defendant Coldwell Banker provided training to Defendant Pelican in Coldwell Banker's methods of operation. [Doc. 19, ¶12]

- On information and belief, at all relevant times material to this lawsuit, Defendant Coldwell Banker provided periodic supervision to Defendant Pelican, as deemed necessary by Coldwell Banker employees who visited Defendant Pelican to assess their business. [Doc. 19, ¶13]

- On information and belief, at all relevant times material to this lawsuit, Defendant Coldwell Banker prescribed business hours during which Defendant Pelican was required to have a manager on site. [Doc. 19, ¶14]

- On information and belief, at all relevant times material to this lawsuit, Defendant Pelican was required to operate subject to a policy manual that it received from Defendant Coldwell Banker. [Doc. 19, ¶15]

Indeed, both Comeaux's Amended Complaint and his motion to dismiss reference the following provisions of the Franchise Agreement that could, also, evidence control by CBREC over Pelican in the operation of its business:

- 1.02 <u>Grant of Franchise</u>. (a) Franchisor hereby grants to Franchisee, and Franchisee hereby accepts, a non-exclusive franchise ("Franchise") to conduct the Franchised Business at the location(s) ("Location(s)") (as hereinafter defined) in strict accordance with this Agreement, any addendum or other ancillary written agreement relating hereto, and the Policy Manual from the time of commencement of the Franchised Business until the end of the term hereof and any renewal or extension hereof unless sooner terminated.
- 8.01 <u>Orientation Program</u>. Within 60 days after the Effective Date hereof, Franchisor shall provide training to Franchisee (or, if Franchisee employs a General Manager, to such General Manager) in Franchisor's method of operating the Franchised Business ("Initial Orientation" for Franchisees not in the Small Market Program and "Orientation" for Small Market Program Franchisees). Such person shall spend such

Case 6:12-cv-00767-RFD-CMH Document 44 Filed 11/05/12 Page 13 of 16 PageID #: 266

period of time at Initial Orientation or Orientation as Franchisor shall deem necessary at such place as Franchisor shall designate. The Franchisee, or where applicable, the General Manager, must satisfactorily complete the next scheduled Initial Orientation (or Orientation for Small Market Program Brokers) after the effective date of this Agreement; provided however, that at Franchisee's option, one or more Location Managers need not attend the Initial Orientation (or Orientation for Small Market Program Franchisees) to the extent that the number of persons required to attend such program exceeds the number of Original Locations.

- 8.04 <u>Continuing Assistance</u>.

    (a)  Franchisor shall provide such periodic supervision and assistance as it deems appropriate from Franchisor's field representatives who shall visit the franchised Location(s) from time to time. The frequency and duration of such visits to franchised Locations by representatives of the Franchisor shall be in the sole discretion of the Franchisor.

    (b)  In addition, Franchisor will be available on an ongoing basis at its regional offices for consultation and guidance with respect to the operation and management of the Franchised Business.

    (c)  As part of the above described assistance (i) Franchisor may provide its Business Planning Program, a set of comprehensive business planning tolls for Franchisee office operations, and (ii) Franchisor shall from time to time make available sales and informational material, advise and techniques to Franchisee as it may develop from time to time, all of which shall be further defined in the Policy Manual(s) and collateral support materials as may be published by Franchisor.

- 9.02 <u>General and Location Manager</u>. Franchisee shall employ, on a full-time basis at the time of Opening and thereafter, a General Manager (who may be the Franchisee) and at least one Location Manager per Location who has completed the Initial Orientation, or who has been satisfactorily trained in the reasonable judgment of Franchisor in Franchisor's methods of operation by Franchisee, or if Franchisee employs a General Manager, by such General Manager. Each Location Manager shall devote his or her entire time during normal business hours, as defined in the Policy Manual, to the management, operations and development of the Franchised Business and shall not engage in any other business or investment requiring his or her active participation during normal business hours.

- 9.03 <u>Policy and Procedures Manual</u>.

    (a) Franchisee shall operate the Franchised Business in accordance with the Policy Manual, a copy of which shall be provided to Franchisee at Initial Orientation.

13

>Franchisor shall have the right to modify the Policy Manual at any time and from time to time but the addition, deletion or other modification of the provisions thereof to the extent necessary or desirable in the sole judgment of Franchisor, to by way of illustration and not limitation, protect the Trademarks and goodwill related thereto, modify said Trademarks, comply with any applicable statute or judicial or administrative decision, improve the quality of services furnished by Franchisee or customers of Franchisor's franchisees, or to improve the operational efficiency of the System. Except as otherwise provided in the Policy Manual, all such additions, deletions or modifications shall be effective five working days after Franchisor has deposited notification to Franchisee of same in the United States mail.
>
>(b) All additions, deletions or modifications of the Policy Manual shall be equally applicable to all similarly situated franchises. The Policy Manual, as modified or amended from time to time, shall not alter Franchisee's fundamental status and rights under this Agreement. As modified from time to time, the Policy Manual shall be deemed to be an integral part of this Agreement and references to the Policy Manual in this Agreement, or in any amendments, exhibits or schedules hereto, shall be deemed to mean the Policy Manual as amended from time to time, unless the context otherwise requires.
>
>(c) Franchisor shall furnish to Franchisee at no additional charge one copy of the Policy Manual per Location at the time of Initial Orientation, which copy shall at all times remain the sole confidential trade secret property of the Franchisor. Upon the expiration or termination of this Agreement for any reason whatsoever, Franchisee shall immediately return the Policy Manuals to Franchisor. At no time may Franchisee make, or cause to be made, any copies or reproductions of all or any portion of the Policy Manuals and shall not disclose the terms thereof to another other person except as is required in the operation of the Franchised Business.

Of particular interest to Comeaux is the so-called "Policy Manual," the terms of which, along with the Franchise Agreement, governed Pelican's operation of the franchise. Comeaux argues because discovery has not begun in the case, it has not seen the Policy Manual, which may provide additional information concerning the nature and scope of control that might have been exercised by CBREC over Pelican in the operation of the real estate business. Comeaux points to several provisions of the Franchise Agreement itself that appear to indicate CBREC exercised some level of control over Pelican, including the fact that CBREC provided training to Pelican; prescribed its hours of operations; and periodically supervised Pelican's employees.

Thus, after a review of the Complaint and Amended Complaint in this case, this Court concludes Comeaux pled sufficient facts to raise a right to relief above the speculative level *vis-a-vis the aspect of control that might or might not exist between CBREC and Pelican*, and has pled facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged," *but only with respect to that aspect of liability that addresses the level of control that CBREC might have had over Pelican.* Specifically, this Court does *not* conclude that the plaintiff has sufficiently alleged a claim for *discriminatory housing practices*, because nowhere has it been demonstrated that it was known to the defendants (including CBREC) at the time of the alleged incident that the plaintiff is African-American.

Thus, as stated herein, notwithstanding the existence of the Franchise Agreement, Comeaux has pled certain facts that might be indicia of control by CBREC over Pelican. Furthermore, again, neither party has briefed the issue of what law would apply to the plaintiff's underlying claims should federal substantive law not apply, although the Court notes were Louisiana law to apply, CBREC has not met the standard required for dismissal of the plaintiff's claims given the status of Louisiana law on apparent or implied authority, and were Louisiana law not to apply, CBREC has not met its burden to show it is entitled to the relief requested. Considering the foregoing, this Court concludes CBREC has not shown the plaintiff has *not* alleged factual allegations which are "enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true," nor has CBREC shown the plaintiff has *not* pled enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949. Consequently, this Court DENIES the instant motion. Whether Comeaux has properly pled a claim for *racially discriminatory* housing practice is unknown to the Court at this time, and indeed, this

Court makes no comment on the *merits* of the underlying substantive claim, but only concludes CBREC is not entitled to the relief it requests at this time.

### III. Conclusion

For the foregoing reasons, the Motion to Dismiss for Failure to State a Claim [Doc. 24] filed by defendant Coldwell Banker Real Estate, LLC is DENIED, for the reasons stated herein.

THUS DONE AND SIGNED in Lafayette, Louisiana, this 5th day of November, 2012.

_____
REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

Court makes no comment on the *merits* of the underlying substantive claim, but only concludes CBREC is not entitled to the relief it requests at this time.

### III. Conclusion

For the foregoing reasons, the Motion to Dismiss for Failure to State a Claim [Doc. 24] filed by defendant Coldwell Banker Real Estate, LLC is DENIED, for the reasons stated herein.

THUS DONE AND SIGNED in Lafayette, Louisiana, this 5th day of November, 2012.

_____
REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE